OPINION
CANBY, Circuit Judge:
Irving Sulmeyer, as trustee in bankruptcy of Co Petro Marketing Group, Inc., (Co Petro), appeals from an order of the Bankruptcy Appellate Panel, 11 B.R. 546, reversing the bankruptcy court, 6 B.R. 119, and remanding with directions to dismiss Co Petro’s petition for reorganization under Chapter 11 of the Bankruptcy Reform Act of 1978 (Bankruptcy Code), 11 U.S.C. §§ 1101-1146 (Supp. III 1979). This appeal raises several questions of first impression under the Bankruptcy Code: 1) whether the definition of a commodity broker, precluded from reorganizing under Chapter 11 of the Bankruptcy Code, includes an entity engaged in selling futures contracts in commodities for which no officially designated or regulated market exists, and 2) whether the Commodity Futures Trading Commission has standing to intervene in a Chapter 11 proceeding for purposes of filing a motion to dismiss, and whether it may appeal an adverse ruling on that motion. We reverse in part, affirm in part, and remand to the Bankruptcy Appellate Panel with direction to reinstate Co Petro’s Chapter 11 petition.
FACTS
On May 19, 1980, Co Petro filed a voluntary petition for reorganization under Chapter 11 of the Bankruptcy Code. At the time of filing Co Petro was subject to a permanent injunction entered on May 7, 1980, by the District Court for the Central *568 District of California. The injunction prohibited Co Petro from dealing in commodity futures contracts in petroleum products in violation of sections 4 and 4h of the Commodity Exchange Act, as amended, 7 U.S.C. §§ 6, 6h (1976). The injunction was the product of certain of Co Petro’s business activities involving sales to the general public of contracts for the future delivery of petroleum products. In an essentially speculative venture, Co Petro and its customers entered into contracts under which the customer paid a deposit to Co Petro, which undertook to secure for the customer a quantity of a particular petroleum product for delivery at a designated future date. Rather than taking delivery, however, the customer at a fixed notice date could appoint Co Petro to resell the contract. If the cash price of the underlying product rose between the purchase date and the notice date, the resulting profit accrued to the customer. If the price fell, the customer could lose, at a maximum, 95% of the initial deposit. None of this trading was performed through a regulated contract market. Upon the Commodity Futures Trading Commission’s application for a permanent injunction, the district court held that these transactions constituted the illegal sale of commodity futures contracts. In an opinion filed simultaneously with this one, we affirmed the district court’s issuance of the permanent injunction and its award of ancillary relief, including the appointment of a receiver, an accounting, and disgorgement of illegally obtained profits. Commodity Futures Trading Commission v. Co Petro Marketing Group, Inc., 680 F.2d 573 (9th Cir. 1982). Shortly after the district court’s decision, Co Petro filed a Chapter 11 petition for reorganization under the Bankruptcy Code. The Commodity Futures Trading Commission sought leave to file a motion to dismiss which the bankruptcy court denied. The bankruptcy court held that Co Petro was not a commodity broker under the Bankruptcy Code and thus could proceed under Chapter 11. The Bankruptcy Appellate Panel reversed, holding that Co Petro was a commodity broker precluded from reorganizing under Chapter 11 and that it was error for the bankruptcy court to deny the Commodity Futures Trading Commission leave to intervene for the purpose of moving to dismiss. Co Petro then filed this appeal.
DEFINITION OF COMMODITY BROKER
Co Petro’s creditors include customers of its illegal commodities scheme, along with other general unsecured creditors of its various legitimate business activities. Under 11 U.S.C. § 109(d), a commodity broker is prohibited from reorganizing under Chapter 11. Instead, its assets must be liquidated under subchapter IV of Chapter 7. 11 U.S.C. §§ 761-766. In a subchapter IV liquidation, claims held by customers of commodity brokers are given priority over all other claims, except those attributable to the administration of customer property. 11 U.S.C. § 766(h). Therefore, if Co Petro were forced into a subchapter IV liquidation, the creditors of Co Petro’s illegal commodity futures sales would have priority over the other general unsecured creditors.
Although the question of statutory interpretation is a difficult one that was impressively addressed by the Bankruptcy Appellate Panel, we cannot agree with the Panel that Co Petro is a commodity broker prohibited by 11 U.S.C. § 109(d) from reorganizing under Chapter 11 of the Bankruptcy Code. At 11 U.S.C. § 101(5), the Bankruptcy Code defines a commodity broker to mean “a futures commission merchant, ... as defined in Section 761 of this title, with respect to which there is a customer, as defined in 761(9) of this title.”[1] Section 761(8) specifies that the term “futures commission merchant” shall have the meaning assigned to the term by the Commodity Exchange Act. The Commodity Exchange Act, as amended, 7 U.S.C. § 2 (1976), defines a futures commission merchant to mean “individuals, associations, partner *569 ships, corporations, and trusts engaged in soliciting or in accepting orders for the purchase or sale of any commodity for future delivery on or subject to the rules of any contract market ” (emphasis added).
In order, then, for Co Petro to be a commodity broker under the Bankruptcy Code, it first must be a futures commission merchant under the Commodity Exchange Act. According to the plain language of the Commodity Exchange Act, denomination as a futures commission merchant requires two conditions: 1) the individual, association, partnership, corporation, or trust must be dealing in orders for the purchase or sale of a commodity for future delivery, and 2) the commodity for future delivery dealt in must be on or subject to the rules of a contract market. Co Petro meets the first criterion. It dealt in commodity contracts for future delivery (futures contracts). The commodities represented by those futures contracts, however, were not on or subject to the rules of any contract market.[2] Although the Commodity Exchange Act does not contain a statutory definition of “contract market”, there is a complex statutory process within the Act setting forth the requirement for designation as a contract market and the duties of those markets. 7 U.S.C. §§ 7-9 (1976). See Merrill, Lynch, Pierce, Fenner & Smith v. Curran,-U.S. -,---, 102 S.Ct. 1825, 1830-31, 72 L.Ed.2d 182 (1982). The Commodity Futures Trading Commission is authorized to designate a board of trade[3] as a “contract market” if it complies with stringent requirements designed to ensure the integrity of futures markets. 7 U.S.C. § 7 (1976). A contract market must be designated in each commodity for which futures trading is sought. See id. After the Commission designates a contract market for the particular commodity, it remains illegal to trade futures contracts for that commodity except by or through a member[4] of the contract market.[5] See, e.g., 7 U.S.C. §§ 6, 6h (1976).
The bankruptcy court found that Co Petro was not a futures commission merchant and, therefore, not a commodity broker because it sold futures contracts for commodities that were not on or subject to the rules of any contract market.[6] The Bankruptcy Appellate Panel disagreed, holding that the phrase “on or subject to the rules of a contract market” merely sets -forth the legal requirement that all commodity futures contracts be traded on a lawfully designated contract market. Such an interpretation, however, renders the limiting language “on or subject to the rules of a contract market” superfluous. Statutes should generally not be construed to render *570 any provision surplusage. United States v. Marubeni America Corp., 611 F.2d 763, 767 (9th Cir. 1980); Pettis ex rel. United States v. Morrison-Knudsen Co., 577 F.2d 668, 673 (9th Cir. 1978). We are required, if possible, to give effect to every word Congress used. Reiter v. Sonotone Corp., 442 U.S. 330, 339, 99 S.Ct. 2326, 2331, 60 L.Ed.2d 931 (1979) . We believe that if Congress had intended that a futures commission merchant include anyone dealing in commodity futures contracts, it would have deleted the limiting phrase “on or subject to the rules of any contract market.”
We recognize, of course, that our objective in interpreting a statute is to ascertain the intent of Congress. Hughes Air Corp. v. Public Utilities Commission, 644 F.2d 1334, 1337 (9th Cir. 1981). Unless a clear contrary legislative intent is brought to our attention, however, we are to interpret a statute according to its plain language. Consumer Product Safety Commission v. GTE Sylvania, Inc., 447 U.S. 102, 108, 100 S.Ct. 2051, 2056, 64 L.Ed.2d 766 (1980) ; United States v. Apfelbaum, 445 U.S. 115, 121, 100 S.Ct. 948, 952, 63 L.Ed.2d 250 (1980); Heppner v. Alyeska Pipeline Service Co., 665 F.2d 868, 871 (9th Cir. 1981). We have been shown no clear evidence that Congress intended the definition of a futures commission merchant broadly to include all persons or entities engaged in selling futures contracts whether or not a contract market exists for those commodity futures.
The Commodity Futures Trading Commission urges, however, that the Commodity Exchange Act and the commodity broker subchapter of the Bankruptcy Code that requires liquidation have as their central purpose the protection of commodity customers. According to the Commission, a finding that Co Petro is not a commodity broker will subvert the clear intent of both statutes. We agree that investor protection is a primary goal of the Commodity Exchange Act. We do' not believe, however, that investor protection will be undermined by holding that one qualifies as a futures commission merchant only by dealing in futures contracts on or subject to. the rules of a contract market. There are several other broad statutory provisions in the Commodity Exchange Act designed to prohibit the type of conduct engaged in by Co Petro. E.g., 1 U.S.C. §§ 6, 6h (1976).[7] The Commodity Futures Trading Commission was successful in obtaining an injunction against Co Petro’s illegal sale of commodity futures without charging Co Petro with a violation of the registration provision of the Act applicable to futures commission merchants. E.g, 1 U.S.C. § 6h (1976). We do not find, therefore, that our holding will significantly impair the Commodity Futures Trading Commission’s mandate to enjoin and prosecute unlawful futures trading.[8]
Nor do we believe that any purpose of the Bankruptcy Code will be subverted by holding that Co Petro is not a commodity broker. In adopting the special bankruptcy provisions for commodity brokers, Congress identified several purposes to be accomplished by the legislation. A Senate Report *571 accompanying the Bankruptcy Reform Act of 1978, listed customer protection as one goal. The report states:
First, customer claims are granted the highest priority against the bankrupt’s estate. This policy maintains consistency with the Commodity Exchange Act, which establishes customer protection as a primary objective and should promote customer confidence in commodity markets generally.
S.Rep. No. 95-989, 95th Cong., 2d Sess. 7-8 (1978). Accord, H.R.Rep. No. 95-595, 95th Cong., 1st Sess. 271 (1977), U.S.Code Cong. & Admin.News 1978, pp. 5787, 5793-94. Although customer protection is a primary purpose of the special subchapter IV liquidation procedures, Congress has made clear what type of broker-customer relationship it sought to protect. In considering the enactment of subchapter IV, the House Committee on the Judiciary noted: “[T]he special procedures are required because of the special relationship between a broker or dealer and his customers.” H.R.Rep. No. 95-595, 95th Cong. 1st Sess. 265 (1977), U.S. Code Cong. & Admin.News 1978, pp. 5963, 6223. The Committee described this relationship as a “deposit relationship,” in which “the customer is not so much dealing with the broker or dealer as through him. Thus, consideration of the broker or dealer’s creditworthiness do not enter into the customer’s decisions. Though a customer is generally a creditor of his broker or dealer, the relationship is not commonly viewed as such.” Id. (emphasis in original). See S.Rep. No. 95-989, 95th Cong., 2d Sess. 106 (1978) (recognizing broker’s status as a trustee).
Thus in the normal commodity broker-customer relationship, the customer expects that the success of his investment will depend solely on the vicissitudes of the particular commodity market, and not on the general financial health of the broker. See Brodt v. Bache & Co., 595 F.2d 459, 461-62 (9th Cir. 1978). The commodity broker liquidation subehapter protects this expectation by providing that margin deposits and securities entrusted to a broker as collateral will not be treated as assets of the commodity broker’s bankruptcy estate.
A “deposit” relationship, characteristic of the fiduciary status of a broker to his customer, does not exist in this ease. At all times, Co Petro’s customers relied directly on the creditworthiness of Co Petro. Co Petro’s customers undertook the obvious risk that Co Petro might not perform on its obligations under the contract if it was without sufficient resources to secure petroleum products on the cash market. Unlike standard commodities transactions in which brokers through existing futures exchanges merely execute orders on behalf of their customers, Co Petro made the market for its customers. Co Petro was responsible for securing the commodity for future delivery and for reselling that commodity at the customer’s election. If Co Petro collapsed, the market it made also would fail and render worthless the contracts it executed. In this way, Co Petro created an edifice whose stability depended upon its solvency. Co Petro’s customers did more than merely “deposit” monies with Co Petro; they engaged in a common speculative venture demarked by a common hope that the price of petroleum products would continue to rise. There is no question that the scheme violated the Commodity Exchange Act. The question whether the claims of these customers should be paid in preference to other creditors, however, is to be answered from the Bankruptcy Code. See Nathanson v. Labor Board, 344 U.S. 25, 28-29, 73 S.Ct. 80, 82-83, 97 L.Ed. 23 (1952). We find no warrant in the Bankruptcy Code’s expressed purpose of customer protection that would justify preferential treatment of Co Petro’s customers.[9] Our review of the leg *572 islative history convinces us that Congress merely sought to preserve in the commodity broker liquidation subchapter, the traditional depositary relationship between brokers and their customers.[10]
The second expressed purpose of the commodity broker liquidation subchapter supports our interpretation. The Senate report on the legislation continues as follows:
A second basic objective of this sub-chapter is the protection of commodity market stability. Protection of market stability during a commodity broker insolvency is more difficult in the commodities markets than in other markets. Commodity futures, options, and leverage contracts all have limited duration. In addition, gains and losses on open positions in the futures markets are paid out on a daily basis through variation margin payments.... Delay by the trustee can result in default in making the daily variation margin payments, or default on delivery, either of which could have a ripple effect that disrupts the entire market. Further, abrupt actions by the trustee could seriously disrupt orderly trading, resulting in substantial losses to the bankrupt, its customers, and other market participants. S.Rep. No. 95-989, 95th Cong., 2d Sess. 8 (1978), U.S.Code Cong. & Admin.News 1978, p. 5794. See H.R. Rep. No. 95-595, 95th Cong., 1st Sess. 271-72 (1977).
The commodity market created by Co Petro has been enjoined. The trustee in bankruptcy is prohibited from engaging in or otherwise carrying out Co Petro’s commodity, contracts. Abrupt actions or delay by the trustee potentially disruptive of commodity market stability in other bankruptcy contexts are not concerns in the present case. If we were to hold that Co Petro is a commodity broker subject to subchapter IV liquidation, we would be protecting customers Congress has evinced no desire to protect. Moreover, we would be doing so without contributing to the protection of commodity market stability. Neither the language of the statute nor the policy of the Bankruptcy Code requires us to reach such a result. We hold, therefore, that Co Petro is not a commodity broker within the meaning of the Bankruptcy Code. Accordingly, we reverse the Bankruptcy Appellate Panel’s decision to the contrary, and remand to that panel, with directions to re-instate Co Petro’s Chapter 11 petition.
STANDING OF THE COMMISSION
We agree with the Bankruptcy Appellate Panel that the Commodity Futures Trading Commission had standing to intervene for the purpose of moving to dismiss Co Petro’s chapter 11 petition. The Bankruptcy Code provides at 11 U.S.C. § 1109(b) that any party in interest may raise, appear, and be heard on any issue in a chapter 11 proceeding. The Bankruptcy Appellate Panel on the authority of SEC v. United States Realty, 310 U.S. 434, 60 S.Ct. 1044, 84 L.Ed. 1293 (1940), correctly found that the Commission is a party in interest.[11] In United States Realty, the SEC sought to intervene to move to dismiss a chapter 11 reorganization proceeding on the ground that chapter 10 provided the sole procedure under which the debtor could reorganize. The Supreme Court upheld the SEC’s right *573 to intervene stating: “[T]he Commission has a sufficient interest in the maintenance of its statutory authority and the performance of its public duties to entitle it through intervention to prevent reorganizations, which should rightly be subjected to its scrutiny, from proceeding without it.” 310 U.S. at 460, 60 S.Ct. at 1055. We conclude, as did the Bankruptcy Appellate Panel, that the Commodity Futures Trading Commission has substantially the same interest as the SEC in ensuring that persons not entitled to proceed under chapter 11 be precluded from doing so.[12]
The trustee contends that even if the Commission was entitled to intervene in the original bankruptcy proceedings, it was not entitled to appeal to the Bankruptcy Appellate Panel. The trustee relies upon the analogy between the Commodity Futures Trading Commission and the SEC, and upon 11 U.S.C. § 1109(a), which provides: “The Securities and Exchange Commission may raise and may appear and be heard on any issue in a case under this chapter, but the Securities and Exchange Commission may not appeal from any judgment, order or decree entered in the case.” We do not, however, accept the proposition that the denial of SEC appeal in § 1109(a) must be applied to the Commission in this case. In order to intervene in this proceeding, the Commodity Futures Trading Commission had to show that it was a party in interest within the meaning of United States Realty, supra, and § 1109(b). Because it was not the SEC, it could not avail itself of the unrestricted permission to “appear and be heard on any issue in a case” under Chapter 11, which is granted to the SEC by § 1109(a). Having shown itself to be a party in interest, which the SEC is not required to do, the Commission should be entitled to the right of appeal normally enjoyed by such parties.[13] The statutory restriction of § 1109(a) against appeals by the SEC is applicable to the Commission neither in express language nor in spirit. We accordingly agree with the Bankruptcy Appellate Panel that the Commission’s appeal was properly taken.
CONCLUSION
The decision of the Bankruptcy Appellate Panel is affirmed in part, reversed in part, and remanded for further proceedings consistent with this opinion.
RUSSELL E. SMITH, District Judge, concurs in the result.

. Because we find that Co Petro is not a futures commission merchant, we need not decide whether the statutory definition of customer has been satisfied.

. No party has claimed in this appeal that Co Petro sold futures contracts already listed on a contract market.

. The Commodity Exchange Act defines “board of trade” as “any exchange or association, whether incorporated or unincorporated, of persons who shall be engaged in the business of buying or selling commodity or receiving the same for sale on consignment.” 7 U.S.C. § 2. The Bankruptcy Code provides that “board of trade” shall have the meaning assigned by the Commodity Exchange Act. 11 U.S.C. § 761(8).

. The Commodity Exchange Act defines “member of a contract market” as “individuals, associations, partnerships, corporations, and trusts owning or holding membership in, or admitted to membership representation on, a contract market or given members’ trading. privileges thereon.” 7 U.S.C. § 2.

. The Bankruptcy Code’s definition of a “contract market” is consistent with the Commodity Exchange Act. At 11 U.S.C. § 761(7), the Bankruptcy Code defines a “contract market” as a “board of trade designated as a contract market by the [Commodity Futures Trading] Commission under the [Commodity Exchange] Act.”

. We have held in a related case that Co Petro violated the Commodity Exchange Act by trading futures contracts otherwise than by or through a member of a contract market or without seeking or receiving contract market designation itself. Commodity Futures Trading Comm’n v. Co Petro Marketing Group, Inc., 680 F.2d 573 (9th Cir. 1982). The statute at issue, however, did not require that such contracts be “on or subject to the rules of a contract market.” It required only that such contracts be “on or subject to the rules of a board of trade.” 7 U.S.C. § 6. Because we found Co Petro to be a board of trade, its conduct was clearly within the statutory prohibition.

. This is not a case where, by virtue of a restrictive reading of the statute, a wrongdoer escapes liability because of his illegal business status. See Commodity Futures Trading Comm’n v. Savage, 611 F.2d 270, 282 (9th Cir. 1979).

. The Commission argues that the district court’s disgorgement order in the prior injunc-tive proceeding was intended to provide special protection and relief for Co Petro’s commodity customers. If Co Petro is permitted to reorganize under chapter 11, the Commission contends this special protection would be diluted because general creditors would share in the disgorged funds. In affirming the disgorgement order, however, we noted that the rationale behind disgorgement is that it would frustrate the regulatory provisions of the Commodity Exchange Act to allow a violator to retain his ill-gotten gains. Commodity Futures Trading Comm’n v. Co Petro Marketing Group, Inc., 680 F.2d 573 (9th Cir. 1982); Accord, Commodity Futures Trading Comm’n v. Hunt, 591 F.2d 1211, 1223 (6th Cir.), cert. denied, 442 U.S. 921, 99 S.Ct. 2848, 61 L.Ed.2d 290 (1979). See SEC v. Texas Gulf Sulphur Co., 446 F.2d 1301, 1308 (2d Cir.), cert. denied, 404 U.S. 1005, 92 S.Ct. 561, 30 L.Ed.2d 558 (1971). The question of creditor preferences, therefore, is not implicated in the disgorgement order and is an issue .to be decided under the Bankruptcy Code.

. Indeed there would be difficulties in attempting to apply the commodity broker liquidation subchapter to Co Petro. For example, 11 U.S.C. § 766 provides that the trustee of a commodity broker’s estate must answer margin calls on customers’ contracts and prevent any open contract that’s actively traded from remaining open past its due date. Presumably an injunction prohibiting any trading in illegal contracts would override this statute. The fact that this conflict might arise at all, however, demonstrates that the subchapter is not de *572 signed to deal with a market rendered defunct by an injunction against its unlawful operation.

. The testimony of the Commodity Futures Trading Commission Chairman, William Bag-ley, provided the basis for many of the commodity broker provisions enacted in the 1978 Bankruptcy reform legislation. H.R.Rep. 95-595, 95th Cong., 1st Sess. 271 (1977) (“The context of the provisions [on commodity broker liquidations] is derived largely from testimony of Chairman Bagley.”). In our review of Chairman Bagley’s testimony, we find nothing to indicate that he was concerned with either the type of customer or the type of unlawful market involved in this case. See Hearings on H.R. 31 and H.R. 32 before the Subcommittee on Civil and Constitutional Rights of the House Committee on the Judiciary, pt. 4, 94th Cong., 2d Sess. 2377-2420 (1976).

. The Bankruptcy Court also found that the Commission was a party in interest but precluded its intervention because the Commission failed to file a formal motion to intervene. The Bankruptcy Appellate Panel reversed this determination and Co Petro does not appeal from its ruling.

. We hold only that the Commission is a party in interest for the purpose of intervening to move to dismiss an improperly filed chapter 11 petition.

. We express no opinion regarding the Commission’s contention that the SEC is entitled to appeal in cases where it qualifies as a party in interest under § 1109(b).